715 S.E.2d 655

**STEVENS AVIATION, INC., Respondent,**

**v.**

**DYNCORP INTERNATIONAL LLC, and Science Applications International Corporation, Defendants,**

**of whom DynCorp International LLC is, Appellant.**

No. 4857.

Court of Appeals of South Carolina.

Heard June 22, 2011.

Filed July 27, 2011.

Rehearing Denied Oct. 13, 2011.

302

C. Mitchell Brown, A. Mattison Bogan, and Michael J. Anzelmo, all of Columbia; and William S. Brown, Lane W. Davis, and Steven E. Buckingham, all of Greenville, for Appellant.

Keith D. Munson and Catherine R. Atwood, both of Greenville; and Linda L. Shapiro, Kathy A. Wisniewski, and John W. Rogers, all of St. Louis, MO, for Respondent.

THOMAS, J.

In this action, DynCorp International LLC (DynCorp) appeals a circuit court's grant of partial summary judgment to Stevens Aviation, Inc. (Stevens) on the interpretation of a contract between DynCorp and Stevens. DynCorp argues the circuit court erred in (1) granting partial summary judgment on grounds not before it; (2) incorporating a prior agreement between Stevens and DynCorp into a later agreement between them; (3) holding the later agreement was an enforceable requirements contract; and (4) ruling on these issues without permitting DynCorp to conduct further discovery. We reverse.

## FACTS & PROCEDURAL HISTORY

Sometime before March 2000, the United States federal government issued a request for bids on an aviation maintenance contract for C–12, RC–12, and UC–35 airplanes owned by the United States Army and Navy (the Prime Contract). The Prime Contract provides that the contractor shall conduct "strip and paint" services, "aircraft condition inspection" (ACI), "site organizational maintenance," and "over and above maintenance" of C–12s, RC–12s, and UC–35s.

On March 16, 2000, DynCorp and Stevens entered a "Teaming Agreement" that imposed certain duties on each party to coordinate a proposal to secure the Prime Contract, with DynCorp as the contractor and Stevens as the subcontractor. The Teaming Agreement also explicitly incorporated two attachments. First, it incorporated an attachment titled "Statement of Work," which provided that Stevens "shall be proposed to perform" ACIs, "strip and paint requirements," and "depot level maintenance for the C–12/RC–12 aircraft fleet" above DynCorp's capabilities. Second, it incorporated an attachment titled "Proprietary Data Provisions," which limited both parties' rights to disclose each other's proprietary business information.

DynCorp was subsequently awarded the Prime Contract, and on March 20, 2001, the parties entered a "Subcontract" that governs their relationship in performing the Prime Contract. Two provisions of the Subcontract's "Preamble" provide the following:

WHEREAS, the parties entered into a Teaming Agreement ("TA") executed on 16 March, 2000, which identifies the roles and responsibilities of the parties as Prime and Subcontractor in a cooperative effort to perform the requirements of U.S. Army Contract DAAH23–00–C–0226 ("Prime Contract");

WHEREAS, this Subcontract supersedes all prior written or oral agreements between the parties, excluding the Proprietary Data Exchange Agreement executed on March 16, 2000, and constitutes the entire agreement between the parties hereto with respect to this Subcontract;

. . . .

NOW THEREFORE, in consideration of the promises, mutual covenants and agreements contained herein, the parties hereto agree as follows:

Two pages later, the Subcontract defines "Aircraft" as "all Army RC/C–12 and UC–35 aircraft covered under the Prime Contract."

Section C of the Subcontract specifically addresses Stevens's duties regarding the work to be performed for Dyn-Corp:

C.1 *STATEMENT OF WORK/TECHNICAL SPECIFICATION*

A. The work shall be performed in accordance with the [Prime Contract's Statement of Work] (Contract DAAH23–00–C–0226; Attachment 1).

B. C–12/RC–12 STRIP AND PAINT. [Stevens] shall provide all labor, services, facilities, equipment, and direct and indirect parts and materials required to strip and completely repaint aircraft (for other than ACI requirements), at the direction of DynCorp. Such work will be performed in accordance with the [Prime Contract's Statement of Work], Section 4 (4.1.3) . . . .

C. AIRCRACT CONDITION INSPECTION (ACI). [Stevens] shall provide all labor, services, equipment, tools, facilities, tooling, lubricants, excluding engine oil, direct and indirect parts and material, fuel, and strip and repaint services required to perform all the requirements of Appendix P [the Prime Contract's] Statement of Work . . . . Items

found defective beyond those addressed by Appendix P will be handled on an Over–and–Above basis.

D. OVER AND ABOVE MAINTANENCE. [Stevens] shall perform both Depot and Non–Depot Maintenance in accordance with Sections 4.0 AND 5.0 of the [Prime Contract's Statement of Work]. DynCorp will reimburse [Stevens] for the labor required for:

. . . .

(3) Other over and above tasks, as directed by DynCorp.

. . . .

E. SITE ORGANIZATIONAL MAINTENANCE. As directed by DynCorp, [Stevens] shall accomplish work, at [Stevens]'s facility, that would normally be performed at the site by the site personnel.

In August 2009, Stevens filed a complaint against DynCorp, alleging DynCorp breached the Subcontract by diverting C–12s, RC–12s, and UC–35s to other businesses for maintenance work covered by the Subcontract. After the parties filed numerous motions, the circuit court granted partial summary judgment to Stevens. The circuit court held the Subcontract incorporated the Teaming Agreement and constituted an enforceable requirements contract for specified maintenance of the C–12s, RC–12s, and UC–35s covered by the Prime Contract. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in granting partial summary judgment on grounds not before it?

2. Did the circuit court err in incorporating the Teaming Agreement into the Subcontract?

3. Did the circuit court err in finding the Subcontract created an enforceable requirements contract as a matter of law?

4. Did the circuit court err in granting partial summary judgment without permitting DynCorp to conduct discovery?

## STANDARD OF REVIEW

When reviewing the grant of summary judgment, "this Court applies the same standard as that required for the circuit court under Rule 56(c), SCRCP. Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Wallace v. Day,* 390 S.C. 69, 73, 700 S.E.2d 446, 448 (Ct.App.2010) (per curiam) (citations and internal quotation marks omitted).

A contract or provisions within it are unambiguous if they are not "susceptible to more than one reasonable interpretation...." [1] *TEG–Paradigm Envtl., Inc. v. U.S.,* 465 F.3d 1329, 1338 (Fed.Cir.2006). "When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions." *Id.* (internal quotation marks omitted).

## I. Grounds Not Before the Circuit Court

DynCorp asserts it lacked notice the circuit court would consider whether the Subcontract incorporated the Teaming Agreement. However, DynCorp did not make this argument in its Rule 59(e) motion or memorandum supporting that motion. Therefore, the issue is not preserved for our review. *See In re Estate of Timmerman,* 331 S.C. 455, 460, 502 S.E.2d 920, 922 (Ct.App.1998) ("When a party receives an order that grants certain relief not previously contemplated or presented to the circuit court, the aggrieved party must move, pursuant to Rule 59(e), SCRCP, to alter or amend the judgment in order to preserve the issue for appeal.").

## II. Incorporating the Teaming Agreement

DynCorp next argues the circuit court erred in incorporating the Teaming Agreement into the Subcontract. We agree.

To incorporate the terms of extrinsic material, a contract need not use "magic words." *Northrop Grumman Info.*

---

1. Both the Teaming Agreement and the Subcontract provide they are to be construed using the federal common law of government contracts and, if that law is not dispositive, the laws of Texas.

*Tech., Inc. v. United States,* 535 F.3d 1339, 1346 (Fed.Cir. 2008) (internal quotation marks omitted). However, the contract "must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Id.* at 1345.

▇ Here, the Subcontract identifies the Teaming Agreement with sufficient particularity to incorporate the entire document, but it does not sufficiently communicate an intention to incorporate the Teaming Agreement as a whole. The provision is contained in one of the preamble's "whereas" clauses, and generally, "whereas" clauses "are not considered 'contractual' and cannot be permitted to control the express provisions of the contract. . . ." *KMS Fusion v. United States,* 36 Fed.Cl. 68, 77 (1996). Read in its entirety, moreover, the Subcontract reveals that the parties did not intend to incorporate the Teaming Agreement as a whole. Although incorporation does not require magic language, the Subcontract incorporated other items by using language with such clarity that it is obvious the parties understood how to incorporate substantive provisions of the document into the Subcontract. First, the Subcontract explicitly provides that over fifty federal regulations were "hereby incorporated." Second, the integration clause in the Preamble immediately before the Teaming Agreement language provides that the Subcontract supersedes prior written agreements except for the "Proprietary Data Exchange Agreement executed by the parties on 16 March 2000."[2] *See TEG–Paradigm Envtl.,* 465 F.3d at 1339 ("One common way to incorporate extrinsic evidence is through an integration clause that expressly incorporates the extrinsic evidence.").

---

2. In response to a question from the bench during oral argument, Stevens's answer suggested the Subcontract's mention of the "Proprietary Data Exchange Agreement executed on 16 March 2000" refers to a document titled "Proprietary Data Provisions," which is part of the Teaming Agreement and was executed on March 16, 2000. Thus, if the Teaming Agreement were incorporated in total, the incorporation of this proprietary business information agreement was unnecessary.

If the Subcontract does not incorporate the entire Teaming Agreement, Stevens claims the Subcontract's reference to the Teaming Agreement merely incorporates the Teaming Agreement's provisions that establish the "roles and responsibilities" of the parties. Yet this contention must fail because it would require this court to handpick which duties to incorporate without guidance from the Subcontract. The Subcontract's reference to the "roles and responsibilities of the parties" established by the Teaming Agreement is hardly precise enough to identify which roles and responsibilities the Subcontract incorporates. The Teaming Agreement establishes various duties, many of which would be inapposite to the parties' relationship once the Subcontract was created. For example, the Teaming Agreement imposes a duty on DynCorp to submit a proposal for the Prime Contract, a duty on DynCorp to award the Subcontract to Stevens, and a duty on Stevens to help DynCorp develop the proposal for the Prime Contract. Consequently, the Subcontract does not clearly show the Teaming Agreement was intended to be relevant for more than background law or negotiating history. The circuit court erred in finding the Teaming Agreement was incorporated into the Subcontract.

### III. Requirements Contract

For various reasons, DynCorp contends the circuit court erred in holding the Subcontract was an enforceable requirements contract for maintenance of C–12s, RC–12s, and UC–35s. In the interest of clarity, DynCorp's arguments condense to two points of interest: the Subcontract does not (1) apply to UC–35s or (2) create an exclusive relationship between the parties for all of the services covered. We agree with both contentions.

#### a. Applicability to UC–35s

■ First, DynCorp maintains the Subcontract does not apply to UC–35s. We agree. The Subcontract does not include per-unit pricing for UC–35s, and therefore, it cannot be construed as an enforceable requirements contract for that aircraft. *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed.Cl. 346, 351 (1993) ("[P]er-unit pricing . . . is an essential element in a requirements contract showing that the supplier

is bound to perform regardless of the quantity of work." (internal quotation marks omitted)). Consequently, the circuit court erred in finding the Subcontract was an enforceable requirements contract as to UC–35s governed by the Prime Contract.

### b. Exclusivity of the Contractual Relationship

■ Second, DynCorp insists the Subcontract does not create an exclusive relationship between the parties regarding all of the services it addresses.[3] We agree.

■ To create an enforceable requirements contract under the applicable law, a contract need not include the word "exclusive" or minimum quantity terms; rather, the seller merely must have "the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract. . . . [A]n essential element of a requirements contract is the promise by the buyer to purchase the subject matter of the contract exclusively from the seller." *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1305 (Fed.Cir. 1998) (alterations in original) (internal quotation marks omitted). Terms that suggest exclusivity include language that the seller must "furnish all labor . . . and related services" to the buyer or the buyer must order services for "all its properties" from the seller. *See id.* at 1305. Even if a contract contains such language, however, the contract is not an exclusive requirements contract if the contract merely requires a party "to furnish all labor . . . and related services

---

3. DynCorp further emphasizes that the Subcontract fails to include certain language required by Federal Acquisition Regulations (FAR) to create an enforceable requirements contract. However, the FAR requiring that language does not apply to the Subcontract because it is a private contract. *See* 48 C.F.R. § 1.104 ("The FAR applies to all acquisitions as defined in Part 2 of the FAR, except where expressly excluded."); 48 C.F.R. § 2.101 ("Acquisition means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease. . . ."). In addition, the Subcontract did not incorporate the FAR despite incorporating fifty other FARs. *See Northrop Grumman Info. Tech.*, 535 F.3d at 1344 ("[T]his court has been reluctant to find that statutory or regulatory provisions are incorporated into a contract with the government unless the contract *explicitly* provides for their incorporation." (internal quotation marks omitted)).

on *assigned* properties...." *Id.* at 1305–06 (first emphasis omitted).

Here, the Subcontract includes language that at first glance suggests exclusivity. The Subcontract states Stevens "shall provide all ... [ACI] required to perform Appendix P of the Prime Contract's Statement of Work." However, a thorough review of the provisions establishing the remaining maintenance obligations reveals that the Subcontract does not create "the exclusive right and legal obligation to fill all of [Dyn-Corp's] needs for the ... services described in the contract." *Coyle's Pest Control,* 154 F.3d at 1305 (internal quotation marks omitted). As to the strip and paint services, the Subcontract states that Stevens "shall provide all ... services required to strip and completely repaint aircraft (for other than [ACI] requirements) *at the direction* of DynCorp." Similarly, the Subcontract provides Stevens would perform site organizational maintenance and over and above maintenance "as *directed* by DynCorp." Consequently, we reverse the circuit court's holding that the Subcontract is an enforceable requirements contract for C–12, RC–12, and UC–35 maintenance.[4] DynCorp must pay Stevens for the services under the Subcontract only to the extent that maintenance was performed. *See id.* at 1306 (holding that because a contract was "not enforceable as either a requirements contract or as an indefinite quantity contract[,] ... Coyle [wa]s entitled to payment only for services actually ordered by HUD and provided by Coyle").

## IV. Completion of Discovery

 Lastly, DynCorp argues the circuit court erred in granting partial summary judgment because it considered extrinsic evidence introduced by Stevens without permitting

---

4. Although the ACI provision does not include "at the direction" language, Stevens fails to argue the nonexclusive provisions—the provisions addressing strip and paint, site organizational, and over and above maintenance—are divisible from the remaining portions of the Subcontract such that the Subcontract could create an exclusive relationship. Therefore, we may not consider that argument to enforce the Subcontract. *See I'On, LLC v. Town of Mount Pleasant,* 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("Of course, a respondent may abandon an additional sustaining ground ... by failing to raise it in the appellate brief.").

DynCorp to conduct discovery to refute that evidence. Because the Teaming Agreement is not incorporated into the Subcontract, we agree the circuit court erroneously considered extrinsic evidence. Despite this mistake, however, we grant partial summary judgment without further discovery on the issues before us. Our holdings are a matter of law, and therefore, further discovery of extrinsic evidence to interpret the provisions relevant to this appeal is unnecessary. *See TEG–Paradigm Envtl.*, 465 F.3d at 1338 ("When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions." (internal quotation marks omitted)).

## CONCLUSION

For the aforementioned reasons, the ruling of the circuit court is **REVERSED.**

HUFF and WILLIAMS, JJ., concur.