755 S.E.2d 148

**STEVENS AVIATION, INC., Petitioner,**

v.

**DYNCORP INTERNATIONAL LLC, and Science Applications International Corporation, Defendants,**

**of whom DynCorp International LLC is, Respondent.**

Appellate Case No. 2011–202686.

No. 27369.

Supreme Court of South Carolina.

Heard Jan. 7, 2014.

Decided March 26, 2014.

Rehearing Denied June 25, 2014.

---

Keith D. Munson and Michael J. Bogle, both of Womble Carlyle Sandridge & Rice, LLP, of Greenville, for Petitioner.

C. Mitchell Brown and Michael J. Anzelmo, both of Columbia, and William S. Brown, V and Lane W. Davis, both of

Greenville, all of Nelson Mullins Riley & Scarborough, LLP, for Respondent.

Justice HEARN.

This case concerns whether a subcontract for the maintenance of aircraft requires a contractor to turn to a subcontractor for all maintenance the contractor needs to fulfill a contract with the United States Army. The contractor, DynCorp, contends the contract does not create an exclusive relationship between the parties and it may send aircraft to other maintenance providers. The subcontractor, Stevens, contends the contract is a requirements contract under which DynCorp must send all aircraft requiring maintenance to Stevens.

Stevens moved for a partial summary judgment on the issue, the trial court granted the motion, and the court of appeals reversed and granted partial summary judgment to DynCorp. We reverse the court of appeals' decision in part and affirm in part, holding the contract is a requirements contract for certain aircraft.

## FACTUAL/PROCEDURAL BACKGROUND

DynCorp is a large defense contractor who was interested in being awarded a contract from the United States Army to service the Army's fleet of C–12, RC–12, and UC–35 aircraft. In furtherance of the goal of securing the contract, DynCorp looked to Stevens as a potential subcontractor.

DynCorp and Stevens executed a "Teaming Agreement" which set forth how the parties would cooperate in attempting to procure the Army contract (the Prime Contract). The Teaming Agreement provides that should DynCorp be awarded the Prime Contract, it would award a subcontract to Stevens to perform certain work required under the Prime Contract and specifies in detail what work Stevens would perform.

### A. THE SUBCONTRACT

The Army awarded the Prime Contract to DynCorp, and DynCorp and Stevens subsequently executed a subcontract (the Subcontract). The Subcontract begins with a preamble which provides in part:

WHEREAS, the parties entered into a Teaming Agreement ... which identifies the roles and responsibilities of the parties as Prime and Subcontractor in a cooperative effort to perform the requirements of U.S. Army Contract DAH23–00–C–0226 ("Prime Contract");

WHEREAS, this Subcontract supersedes all prior written or oral agreements between the parties, excluding the Proprietary Data Exchange Agreement ... and constitutes the entire agreement between the parties with respect to this Subcontract.

The body of the Subcontract begins with a definitional section which defines the term "Aircraft" as: "All Army RC/C–12 and UC–35 aircraft covered under the Prime Contract." The Subcontract has a "Statement of Requirements" which provides that:

A. [Stevens], as a Subcontractor to DYNCORP, shall provide items consisting of management, parts and materials, repairs, skilled labor, facilities and engineering data for the maintenance and repair of the Government's fleet of C–12/RC–12 Aircraft and related support equipment under the Prime Contract as specifically set forth in Section B.

B. [DynCorp] is not required to purchase from the Subcontractor any requirement in excess of the total funding identified under Section G under this Subcontract.

The Subcontract makes use of "CLINs"—"Contract Line Item Number[s]" which are carried over from the Prime Contract—to describe the work to be performed and defines eight CLINs as covered by the Subcontract. The Subcontract contains a Statement of Work defining the different CLINs in part as:

B. C–12/RC–12 STRIP AND PAINT. [Stevens] shall provide all labor, services, facilities, equipment, and direct and indirect parts and materials required to strip and completely repaint aircraft (for other than ACI requirements), at the direction of [DynCorp]. . . .

C. AIRCRAFT CONDITION INSPECTION (ACI). [Stevens] shall provide all labor, services, equipment, tools, facilities, tooling, lubricants, excluding engine oil, direct and indirect parts and material, fuel, and strip

and repaint services required to perform all the requirements of [the Prime Contract's] Statement of Work....

D. OVER AND ABOVE MAINTENANCE. [Stevens] shall perform both Depot and Non–Depot Maintenance in accordance with Sections 4.0 and 5.0 of the [Statement of Work], and shall provide parts and materials required for the same....

E. SITE ORGANIZATIONAL MAINTENANCE. As directed by [DynCorp], Stevens shall accomplish work, at [Stevens'] facility, that would normally be performed at the site by the site personnel.

The Subcontract provides a schedule of per-unit or per-hour prices for each of the CLINs.

Section G limits the parties' relationship based on the funding available from the Prime Contract. It provides that if funds from the Prime Contract are exhausted for any CLIN, Stevens has no obligation to continue to perform that CLIN and DynCorp is not liable for any performance Stevens engages in after the funding for a CLIN is exhausted.

The Subcontract provides that DynCorp may terminate the contract or seek other remedies upon the occurrence of any of several enumerated ways in which Stevens may default. Among those, Stevens may default by failing to faithfully perform its obligations for ten days after receipt of a cure notice, receiving three or more cure notices in one year, or suspending its operations.

The Subcontract contains an integration clause providing: "This Subcontract constitutes the entire understanding of the parties with respect to the subject matter hereof, and supersedes all prior representations and agreements, except for those specifically and expressly incorporated herein." Finally, the Subcontract provides that it is to be construed according to the "federal common law of government contracts."

## B. THE PRESENT SUIT

The parties performed under the Subcontract for approximately nine years until Stevens believed that DynCorp was sending C–12 and RC–12 aircraft covered by the Subcontract

to other aviation maintenance providers. Stevens brought suit against DynCorp alleging it breached the Subcontract by sending covered aircraft to other service providers. DynCorp moved for a judgment on the pleadings asserting the Subcontract does not create an exclusive relationship between Dyn-Corp and Stevens and therefore Stevens' breach of contract claim fails as a matter of law. Stevens moved for a judgment on the pleadings or, in the alternative, a partial grant of summary judgment finding the Subcontract creates an exclusive relationship.

The circuit court denied both motions for judgment on the pleadings, but granted Stevens' partial motion for summary judgment, holding the Subcontract "is a 'requirements contract' which obligates DynCorp to send to Stevens all C–12, RC–12, and UC–35 aircraft submitted to DynCorp under [the Prime Contract] for the purpose of allowing Stevens to perform the aviation maintenance services specified in that [Subcontract]." In support of that holding, the circuit court found the Subcontract is unambiguous, the Teaming Agreement is incorporated into the Subcontract, and the language of the Subcontract combined with the language of the Teaming Agreement unambiguously establishes that the Subcontract is a requirements contract.

DynCorp appealed asserting the circuit court erred in granting partial summary judgment before the completion of discovery, in granting partial summary judgment on grounds not before the court, in finding the Teaming Agreement was incorporated into the Subcontract, and in holding the Subcontract created an exclusive relationship between the parties. The court of appeals reversed the circuit court, first holding the Teaming Agreement is not incorporated into the Subcontract. *Stevens Aviation, Inc. v. DynCorp Intern. LLC,* 394 S.C. 300, 307–09, 715 S.E.2d 655, 659–60 (Ct.App.2011). The court reasoned that the reference to the Teaming Agreement is in a "whereas" clause and such clauses are generally not considered contractual and not permitted to control express provisions of a contract. *Id.* at 308, 715 S.E.2d at 659. The court went on to find the contractual language establishes the parties did not intend to incorporate the Teaming Agreement because an incorporation provision contained in a "whereas"

clause provides that the Subcontract supersedes any prior written agreements.

Having found the Teaming Agreement was not incorporated, the court considered the language of the Subcontract and concluded it does not establish an exclusive relationship between the parties and therefore is not an enforceable requirements contract. *Id.* at 309–11, 715 S.E.2d at 660–61. As an initial matter, the court found the Subcontract does not apply to UC–35 aircraft because it does not contain per-unit pricing for those planes. *Id.* at 309–10, 715 S.E.2d at 660. Addressing exclusivity generally, the court acknowledged some language in the Subcontract suggests exclusivity, but found other language established that no exclusive relationship exists. *Id.* at 311, 715 S.E.2d at 661. Specifically, the court quoted the language in the Subcontract's Statement of Work providing that Stevens is to perform strip and paint services *"at the direction* of DynCorp" and is to perform other maintenance *"as directed* by DynCorp." *Id.* The court concluded the Subcontract is not an enforceable contract and therefore DynCorp is only obligated to pay Stevens for work already performed. *Id.* Finally, the court granted partial summary judgment to DynCorp. *Id.* at 312, 715 S.E.2d at 661. This Court granted certiorari to review the court of appeals' decision.

## ISSUES PRESENTED

I. Did the court of appeals err in holding the Subcontract is not an enforceable requirements contract for C–12 and RC–12 aircraft covered by the Prime Contract?

II. Did the court of appeals err in holding the Subcontract is not an enforceable requirements contract for UC–35 aircraft covered by the Prime Contract?

III. Did the court of appeals err in granting summary judgment to DynCorp when DynCorp never moved for summary judgment?

## STANDARD OF REVIEW

While federal law governs the Subcontract, the South Carolina Rules of Civil Procedure and South Carolina Rules of Appellate Procedure govern the resolution of this

dispute. Rule 56(c) of the South Carolina Rules of Civil Procedure provides that a trial court may grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether a genuine issue of material fact exists, the evidence and inferences that can reasonably be drawn therefrom are to be viewed in the light most favorable to the nonmoving party. *Quail Hill, LLC v. Cnty. of Richland,* 387 S.C. 223, 235, 692 S.E.2d 499, 505 (2010). In reviewing a grant of summary judgment, an appellate court applies the same standard as the trial court. *Id.*

## LAW/ANALYSIS

### I. C–12 AND RC–12 AIRCRAFT

■ Stevens contends that regardless of whether the Subcontract incorporates the Teaming Agreement, it establishes an exclusive relationship between the parties and is an enforceable requirements contract. We agree as to the C–12 and RC–12 aircraft and conclude the court of appeals erred in holding to the contrary.

■ Under the federal common law, a services or supply contract must fit into one of three forms: a contract for a definite quantity, a contract for an indefinite quantity, or a requirements contract. *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1331 (Fed.Cir.2000). As set forth in *Torncello v. United States,* 681 F.2d 756 (Ct.Cl.1982), and quoted by subsequent federal decisions, these three forms of supply contracts are described as:

> With contracts for a definite quantity, the promises and obligations flowing from each party to the other define both the minimum and maximum performances of each and furnish the consideration from each party that courts require for enforceability. With indefinite quantities contracts, however, the buyer's promise specifically is uncertain, and such a contract would fail for lack of consideration if it did not contain a minimum quantity term. Without an obligatory minimum quantity, the buyer would be allowed to order

nothing, rendering its obligations illusory and, therefore, unenforceable. Requirements contracts also lack a promise from the buyer to order a specific amount, but consideration is furnished, nevertheless, by the buyer's promise to turn to the seller for all such requirements as do develop. Such contracts clearly are enforceable on that basis. The entitlement of the seller to all of the buyer's requirements is the key, for if the buyer were able to turn elsewhere for some of its needs, then the contract would not be distinguishable from an indefinite quantities contract with no stated minimum, unenforceable as we have stated.

*Torncello,* 681 F.2d at 761–62 (citations omitted).[1]

 "Contract interpretation begins with the plain language of the agreement." *Gould Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). In determining which type of services or supply contract parties entered into, a court is to look "beyond the first page of the contract to determine what were the legal rights for which the parties bargained." *Crown Laundry & Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506, 515 (1993). Courts are to "assume that the parties intended that a binding contract be formed," and "[t]hus, any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract." *Torncello,* 681 F.2d at 761, *see also Crown Laundry,* 29 Fed.Cl. at 515–16 ("[B]ecause it must be assumed that the

---

1. We reject DynCorp's assertion that in light of the United States Court of Appeals for the Federal Circuit's decision in *Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302 (Fed.Cir.1998), a fourth form of services or supply contract—a "purchase order pricing structure contract"—exists. DynCorp suggests the Subcontract is such a "purchase order pricing structure contract" whereby DynCorp contractually only must pay Stevens for services DynCorp orders and Stevens completes at their previously agreed upon pricing. *Coyle's* plainly did not approve such a contract. To the contrary, the *Coyle's* decision made clear the contract at issue there was not enforceable. *Coyle's,* 154 F.3d at 1304 (finding "no error in the Board's reasoning or conclusion" that "the contract is not enforceable for lack of consideration"). DynCorp misreads the language in *Coyle's* providing that the plaintiff was "entitled to payment only for services actually ordered by [the defendant] and provided by [the plaintiff]." *Id.* at 1306. Having found the contract unenforceable, that language clearly did not establish a new form of services or supply contracts, but rather merely acknowledged that the plaintiff could recover on equitable grounds for services ordered and performed.

parties intended to form a binding contract, the court should favor an interpretation that saves the contract instead of voiding it.").[2] Additionally, "an interpretation that gives meaning to all parts of the contract is preferable to one which renders provisions in the contract meaningless or superfluous." *Crown Laundry*, 29 Fed.Cl. at 515.

Here, the contractual language indicates an intent to establish an exclusive relationship between the parties. The Subcontract's Statement of Requirements provides that Stevens, as DynCorp's subcontractor, is to provide aircraft maintenance to "the Government's *fleet* of C–12/RC–12 Aircraft ... under the Prime Contract." (emphasis added). The use of the word "fleet" indicates Stevens is to service *all* of the government's C–12 and RC–12 aircraft covered by the Prime Contract rather than just those aircraft DynCorp chooses to send to Stevens.

Additionally, the Statement of Requirements provides that DynCorp "is not required to purchase from the Subcontractor any requirement in excess of the total funding" under the Prime Contract. That language implies that DynCorp is required to purchase from Stevens all requirements within the total funding provided by the Prime Contract. If that was not

---

**2.** We also reject DynCorp's contention that the *Coyle's* decision overturned this rule of contract construction. In *Coyle's,* the court rejected "the notion that *Torncello ... requires* [a court] to save an otherwise unenforceable indefinite quantity contract by interpreting it as an 'implied' requirements contract." *Coyle's,* 154 F.3d at 1304 (emphasis added). DynCorp urges this Court to read that holding as rejecting *Torncello's* instruction to favor an interpretation of an enforceable requirements contract where such an interpretation is possible. However, the *Coyle's* holding does not extend that far and only rejected the extreme reading of *Torncello* as requiring a court to interpret an otherwise unenforceable contract as a requirements contract. DynCorp fails to acknowledge that *Torncello* only instructs a court to favor an interpretation as a requirements contract, rather than as an unenforceable agreement, *only* when the contract is susceptible to interpretation as a requirements contract. *Torncello,* 681 F.2d at 761 (stating a court should favor an interpretation as a requirements contract only when that is a legitimate "choice of alternative interpretations"). The *Coyle's* court made this distinction clear, stating "the *Torncello* court implicitly rejected a rule of 'saving the contract' by interpreting it as a requirement contract when it is not so susceptible." *Coyle's,* 154 F.3d at 1305.

the case, the provision would be superfluous because DynCorp could purchase only those services from Stevens it so chooses.

The Subcontract's Statement of Work also evidences an intent to create an exclusive relationship. Its description of the "strip and paint" work states that Stevens "shall provide all " services needed to "strip and completely repaint aircraft." (emphasis added). The Subcontract defines "Aircraft" as including "all" C–12 and RC–12 aircraft covered by the Prime Contract. Similarly, the Statement of Work's description of the "aircraft condition inspection" work states that Stevens "shall provide all " services needed to "perform all the requirements" of the Prime Contract's Statement of Work. The Statement of Work also states that Stevens "shall perform both Depot and Non–Depot Maintenance." Finally, the Subcontract sets forth a detailed list of per-unit pricing for each of the items of work Stevens is to perform. While these provisions do not explicitly state that the Subcontract creates an exclusive relationship between the parties, they utilize language consistent with and indicative of such a relationship.

Additionally, to interpret the Subcontract as not creating an exclusive relationship would render the Subcontract's termination provisions superfluous. The Subcontract's termination provisions permit DynCorp to terminate the Subcontract if Stevens fails to perform despite receipt of cure notices. If the Subcontract is not a requirements contract, the termination provision would be superfluous. DynCorp would not need to issue cure notices or formally terminate the contract. DynCorp could effectively unilaterally terminate the contract at any time by choosing to not send additional aircraft to Stevens.

The court of appeals erroneously discounted that contractual language and focused on the "at the direction of" language used in the Subcontract's Statement of Work for the "strip and paint" and "site organizational maintenance work." *Stevens Aviation*, 394 S.C. at 311, 715 S.E.2d at 661. Presumably, the court of appeals believed that language indicated Stevens was only to perform work on those aircraft that DynCorp directed it to perform work on, thus leaving open the

possibility of DynCorp sending some aircraft to other maintenance providers. We find this contractual language does not support that conclusion. As we understand the Subcontract, C–12 and RC–12 aircraft would come to Stevens for an inspection. After Stevens performed the inspection, some of the inspected aircraft would need to be stripped and painted. Thus, the "at the direction of" language for the strip and paint work is best interpreted as meaning that DynCorp directs Stevens as to which aircraft need to be stripped and painted and how they are to be stripped and painted. The fact that DynCorp can tell Stevens which aircraft need this work is in no way inconsistent with Stevens performing all such "strip and paint work."

For the "site organizational maintenance" work, the Subcontract's description of that work is instructive:

> Both Parties recognize that at times it will be beneficial for work that would have normally been performed at the site by the site personnel to be accomplished at [Stevens'] facility. [Stevens] is not authorized to proceed with such efforts without written authorization from DYNCORP. The procedures for request, provision of estimate, authorization, and performance of such efforts will be in accordance with Section H.12, "Over and Above Work."

In other words, "site organizational maintenance" is work that needs to be performed at a special location—Stevens' facilities. The fact that Stevens cannot transfer its work under the Subcontract to its facilities without DynCorp's prior authorization in no way conflicts with the premise that Stevens is to perform all such work required by DynCorp. In short, we interpret these provisions as meaning that Stevens is to perform all "strip and paint" work and all "site organizational maintenance" work, but is to do so subject to DynCorp's instructions.

Accordingly, we find the unambiguous language of the Subcontract, regardless of whether the Teaming Agreement is incorporated, establishes an exclusive relationship between the parties as to C–12 and RC–12 aircraft covered by the Prime Contract. Therefore, we hold the Subcontract is an enforce-

able requirements contract as to those aircraft and reverse that portion of the court of appeals' decision.

## II. UC–35 AIRCRAFT

 Stevens also contends the court of appeals erred in holding the Subcontract does not create an exclusive relationship as to UC–35 aircraft covered by the Prime Contract. We disagree.

The Subcontract mentions the UC–35 aircraft in only one provision. The definitions section of the Subcontract defines "Aircraft" as "All Army RC/C–12 and UC–35 aircraft covered under the Prime Contract." However, the remainder of the Subcontract makes clear that it covers only RC–12 and C–12 aircraft by the use of provisions specific to those aircraft and the absence of any provisions related to the UC–35 aircraft. Specifically, the "Statement of Requirements" provides that Stevens "shall provide" services for "the Government's fleet of C–12/RC–12 Aircraft." The UC–35 is never mentioned in the Statement of Work nor in the descriptions of the CLINS covered by the Subcontract.[3] Finally, the Subcontract does not contain a schedule of services and costs for the UC–35 aircraft, and "per-unit pricing . . . is an essential element in a requirements contract. . . ." *Ceredo Mortuary Chapel, Inc. v. United States*, 29 Fed.Cl. 346, 351 (1993). Accordingly, we conclude the Subcontract does not contain language establishing that Stevens is to perform *any* work on the UC–35 aircraft, much less language establishing that Stevens has an exclusive relationship with DynCorp as to the maintenance of the UC–35 aircraft under the Prime Contract. Therefore, we affirm the court of appeals' holding as to the UC–35 aircraft.

## III. THE COURT OF APPEALS' GRANT OF SUMMARY JUDGMENT TO DYNCORP

Finally, we hold the court of appeals erred in granting summary judgment to DynCorp. While this Court has not yet addressed whether an appellate court may grant summary judgment to a party who did not move for that relief below,

---

3. The Statement of Work does use the term "aircraft" in its description of the "strip and paint" work, but the heading for that work is "C–12/RC–12 STRIP AND PAINT."

the rule in other jurisdictions is that an appellate court may do so only under limited circumstances. *See, e.g., Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 494 (9th Cir.2000) ("It is generally recognized that a court has the power sua sponte to grant summary judgment to a non-movant when there has been a motion but no cross-motion."); *In the Matter of Cont'l Airlines*, 981 F.2d 1450, 1458 (5th Cir.1993) ("This court has the power to render summary judgment for a nonmoving party if we find that the moving party is not entitled to summary judgment and that no factual dispute exists and the nonmoving party is entitled to summary judgment as a matter of law."); *Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 212 Ariz. 381, 132 P.3d 825, 830–31 (2006) (acknowledging that an appellate court may grant summary judgment for a nonmoving party where the moving party had an opportunity to address the issue before the trial court and to show that a genuine issue of material fact exists).

We need not decide whether to adopt the rule from these other jurisdictions because the limited circumstances wherein an appellate court may grant summary judgment are not present here. Accordingly, we hold the court of appeals erred in granting summary judgment to DynCorp.

## CONCLUSION

We hold the Subcontract is a requirements contract creating an exclusive relationship as to the C–12 and RC–12 aircraft, reverse the court of appeals' holding to the contrary, and reinstate the circuit court's grant of summary judgment as to this issue. We also affirm the court of appeals' holding that the Subcontract is not a requirements contract as to the UC–35 aircraft. Finally, we reverse the court of appeals' grant of summary judgment to DynCorp.

TOAL, C.J., PLEICONES, BEATTY and KITTREDGE, JJ., concur.