**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1229**

---

JW ALUMINUM COMPANY,

         Plaintiff – Appellant,

v.

ACE AMERICAN INSURANCE COMPANY; WESTPORT INSURANCE CORPORATION; AIG SPECIALTY INSURANCE COMPANY; GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA,

         Defendants – Appellees.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:21-cv-01034-BHH)

---

Argued: December 12, 2024               Decided: March 10, 2025

---

Before DIAZ, Chief Judge, and HEYTENS and BENJAMIN, Circuit Judges.

---

Reversed and remanded by unpublished opinion. Judge Heytens wrote the opinion, which Chief Judge Diaz and Judge Benjamin joined.

---

**ARGUED:** Craig A. Boneau, REID COLLINS & TSAI LLP, Austin, Texas, for Appellant. Brian Cantwell Duffy, DUFFY & YOUNG, LLC, Charleston, South Carolina, for Appellees. **ON BRIEF:** Beattie B. Ashmore, Greenville, South Carolina; Scott D. Saldaña, Dylan E. Jones, Morgan M. Menchaca, Julia L. Di Fiore, REID COLLINS & TSAI LLP, Austin, Texas, for Appellant. Hunter Windham, DUFFY & YOUNG, LLC, Charleston, South Carolina, for Appellees ACE American Insurance Company, Westport Insurance

1

2

Corporation, and General Security Indemnity Company of Arizona. Keith Moskowitz, Chicago, Illinois, Catharine Luo, Washington, D.C., Douglas Janicik, DENTONS US LLP, Phoenix, Arizona, for Appellee AIG Specialty Insurance Company.

_____

Unpublished opinions are not binding precedent in this circuit.

TOBY HEYTENS, Circuit Judge:

A company and its insurers disagree about how a policy provision that caps recovery applies to an accident at an aluminum processing facility. We conclude a key phrase in the relevant provision is susceptible to at least two reasonable interpretations and South Carolina law requires courts to adopt the interpretation most favorable to the company. We thus reverse the district court's order granting summary judgment to the insurers and remand for further proceedings.

I.

JW Aluminum Company owns facilities that melt, process, and finish aluminum. The company holds insurance policies with four insurers. The self-styled "All-Risk" policies are similar in all respects relevant to this appeal and broadly insure JW Aluminum's facilities against physical property damage.

In 2020, there was a major incident at a JW Aluminum facility in South Carolina. For purposes of this appeal, the parties basically agree about what happened. While JW Aluminum workers were "doing a routine maintenance related item," "a small quantity" of molten aluminum "went up in the [air] approximately 35 feet." JA 226–27. The molten aluminum landed on a roof support beam, which started a fire by igniting combustible aluminum dust on the beam. The fire spread to the facility's roof, causing debris to fall and to damage structures and equipment. To avoid an explosion, JW Aluminum shut off the power and natural gas lines, which caused molten aluminum to harden inside other equipment, damaging it. The fire department eventually brought the fire under control, which caused water damage to the facility. The total damage was around $35 million.

3

JW Aluminum sought to collect, but the insurers argued that their liability was capped at $10 million in total. The insurers cited a policy provision that is labeled "endorsement" and addresses harms caused by "Molten Material." JA 315. It reads:

> It is hereby understood and agreed this policy does insure against direct physical loss or damage cause [sic] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence. This policy does not insured [sic] against the following types of loss or damage.
>   1. Loss or damage to such discharged material unless caused by a peril not otherwise excluded.
>   2. The cost of repairing any fault which permitted such accidental discharge unless caused by a peril not otherwise excluded.

*Id.* "Occurrence" is defined in a separate provision as "any loss or series of losses arising out of one event, regardless of the number of locations affected." JA 280. The policies do not define the Molten Material provision's other terms, including "direct," "physical," "loss or damage," "by heat," or "caused."

JW Aluminum sued the insurers in federal court. On cross motions for summary judgment, the district court concluded the Molten Material provision limited the insurers' liability to $10 million. The court acknowledged that most of JW Aluminum's losses were "directly caused by fire, falling debris, water, and frozen molten aluminum inside the equipment" rather than the molten metal itself. JA 7983. But the court viewed that as "an immaterial distinction" because the later harms "arose out of and were caused by one event: the accidental discharge of molten metal." JA 7982–83. And because the Molten Material provision capped the insurers' liability at "$10,000,000 per occurrence," JA 315, the district court concluded the insurers were not liable for more than that amount as a matter of law.

4

The parties settled all remaining issues, and the district court entered a final judgment. The district court had diversity jurisdiction under 28 U.S.C. § 1332, and we have appellate jurisdiction under 28 U.S.C. § 1291.

II.

Because this is a diversity case involving no federal-law issues, state law governs. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The parties agree the relevant State here is South Carolina. We review the district court's decision granting summary judgment de novo, including the court's understanding of South Carolina law. See *Seabulk Offshore, Ltd. v. American Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004); see also *Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991) (requiring appellate courts to review questions of state law de novo).

An insurance policy is, at root, a contract, and "the terms of the policy are to be construed according to contract law." *Auto Owners Ins. v. Rollison*, 663 S.E.2d 484, 487 (S.C. 2008). Under South Carolina law, courts must "give policy language its plain, ordinary, and popular meaning." *State Farm Mut. Auto. Ins. v. Windham*, 882 S.E.2d 754, 757 (S.C. 2022). "Ambiguous or conflicting terms," however, "must be construed liberally in favor of the insured and strictly against the insurer." *Williams v. GEICO*, 762 S.E.2d 705, 710 (S.C. 2014) (quotation marks removed).

We conclude the Molten Material provision is ambiguous and that the district court erred in concluding otherwise. We thus reverse the district court's order granting summary judgment to the insurers and remand for further proceedings.

The policies have a combined general limit of $250 million. On the one hand, the

5

Molten Material provision confirms these policies "do[] insure against direct physical loss or damage cause [sic] by heat from Molten Material, which has been accidentally discharged from equipment." JA 315. On the other hand, it also subjects such losses "to a limit of $10,000,000 per occurrence." *Id.*

But what does "direct physical loss or damage cause[d] by heat from Molten Material" mean? In the district court's view, this provision "unambiguously" reaches any "resulting losses" that "arose out of and [were] caused by" "heat from Molten Material" regardless of whether those losses were "directly caused by fire, falling debris, water, and frozen molten aluminum." JA 7983–84. We respectfully disagree.

To see why, consider some counter-arguments to the district court's reading, starting with the language of the Molten Material provision itself. The district court's interpretation gives no meaning to several words in the first sentence, including "direct" and "heat from." A hypothetical provision without those words—reading "physical loss or damage caused by Molten Metal"—would result in the same limited insurance coverage for JW Aluminum as does the district court's interpretation of the provision. See *Stevens Aviation, Inc. v. DynCorp Intern. LLC*, 756 S.E.2d 148, 153 (S.C. 2014) ("[A]n interpretation that gives meaning to all parts of the contract is preferable to one which renders provisions in the contract meaningless or superfluous." (quotation marks removed)). The district court's interpretation of the policies could also be accused of substituting some words for others because it reads "direct[ly] . . . cause[d] by" as synonymous with "stemming from." Cf. *Abady v. Hanover Fire Ins.*, 266 F.2d 362, 364–65 (4th Cir. 1959) (damage to a pipe caused by freezing weather after wind blew off the pipe's hatch cover was not "loss as a direct

6

result of wind"). In effect, the district court read the Molten Material provision as if it said, "direct physical loss or damage ~~cause by~~ [*stemming*] ~~heat~~ from Molten Material, which has been accidentally discharged from equipment." See JA 315. That may or may not be a defensible interpretation of the Molten Material provision. But it is neither the only nor the unambiguously correct one.[*]

Other policy provisions only reinforce the Molten Material provision's ambiguity. See *Williams*, 762 S.E.2d at 710 (when assessing ambiguity, courts must consider "the entire contract" rather than "isolated portions"). One provision excludes coverage for losses caused by "[n]uclear reaction or nuclear radiation or radioactive contamination" and specifies that this exclusion applies "whether such loss be direct *or indirect*" and "proximate *or remote*." JA 272 (emphasis added). Another provision is even more broadly worded, stating that it "excludes loss, damage, cost, or expense of *whatsoever nature* directly *or indirectly* caused by, resulting from, *or in connection with* any act of terrorism *regardless of any other cause or event contributing concurrently or in any other sequence to the loss*." JA 333 (emphasis added). The absence of any comparably broad language from the Molten Material provision creates ambiguity about whether (and, if so, how) that provision applies to limit losses that even the district court acknowledged were *most*

---

[*] The insurers also suggest the term "direct physical loss or damage" is an insurance coverage "term of art" and refers to coverage for material loss in contrast to economic loss like business interruption. Oral Arg. 21:06–:48; see Insurers Br. 30 (citing *Sullivan Mgmt., LLC v. Fireman's Fund Ins.*, 879 S.E.2d 742, 744 (S.C. 2022)). But that argument could, at most, remove an ambiguity created by the Molten Material provision's use of "direct"; it does nothing to remove the ambiguity caused by the inclusion of "heat from," which no one has argued is an insurance term of art.

directly "caused by fire, falling debris, water, and frozen molten aluminum" and thus only indirectly caused by heat from molten metal. JA 7983.

Echoing the district court's reasoning, the insurers point to the policies' definition of "occurrence"—"any loss or series of losses arising out of one event," JA 280—and argue that definition resolves any ambiguity in the Molten Material provision. In particular, the insurers insist that all the losses here stemmed from a single "occurrence" and that, as a result, the Molten Material provision caps JW Aluminum's recovery at $10 million. Again, we disagree.

For one thing, it is not even clear that the definition applies. The word "occurrence" in the Molten Material provision is uncapitalized. JA 315. But the policies provide that "[w]ords and phrases which begin with a capital letter . . . have special meaning." JA 266. The insurers do not explain why we should read "occurrence" to mean "Occurrence."

Even if it applied, the definition of "occurrence" would not resolve the ambiguities about the meaning of the terms "direct" and "heat from." The insurers' argument views the Molten Material provision as saying, in essence: "This policy does insure against direct physical loss or damage caused by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per *any loss or series of losses (whether directly or indirectly caused by heat from Molten Material) arising out of one event*." But even replacing "occurrence" with its definition elsewhere in the policies ("any loss or series of losses arising out of one event"), JA 280, there is an alternative reading that fits at least as well with the provision's text. That interpretation would read the Molten Material provision as saying: "This policy does insure against direct physical loss

8

or damage caused by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per *any loss or series of losses directly caused by heat from Molten Material arising out of one event*." The underlying ambiguity of the terms "direct" and "by heat" remain, and nothing in the definition of "occurrence," or any other language in the policies, resolves that issue.

*     *     *

The parties spar over other potential sources of ambiguity in the policies and how various possible resolutions of the ambiguities we have identified would impact the proper resolution of this case. We need not resolve those issues here. Under South Carolina law, "[a]mbiguous or conflicting terms . . . must be construed liberally in favor of the insured and strictly against the insurer." *Williams*, 762 S.E.2d at 710 (quotation marks removed). Having concluded there are several such terms here, we reverse the district court's determination that JW Aluminum's total recovery is capped at $10 million as a matter of law. And because "we are a court of review, not of first view," *Grimmett v. Freeman*, 59 F.4th 689, 696 (4th Cir. 2023) (quotation marks removed), we leave all other issues—including whether "damage cause[d] by heat from Molten Material" (JA 315) encompasses fire damage, hardened metal damage, water damage, other types of damage, or some combination thereof—to the district court in the first instance.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*

9