751 S.E.2d 256

**PRESERVATION CAPITAL CONSULTANTS, LLC, Respondent,**

v.

**FIRST AMERICAN TITLE INSURANCE COMPANY, Appellant.**

**Appellate Case No. 2012–209186.**

**No. 27330.**

Supreme Court of South Carolina.

Heard June 5, 2013.
Decided Nov. 20, 2013.

310

Shaun C. Blake and W. Cliff Moore III, of Adams and Reese, LLP, of Columbia, for Appellant.

Susan Elizabeth Driscoll and James W. Sheedy, of Driscoll & Sheedy, P.A., of Charlotte, NC, for Respondent.

Chief Justice TOAL.

First American Title Insurance Company (First American) appeals the circuit court order granting summary judgment in favor of Preservation Capital Consultants, LLC (Preservation Capital). First American argues the circuit court misconstrued the terms of a title insurance policy in finding Preservation Capital was entitled to recover under the policy. This Court certified this case for review pursuant to Rule 204(b), SCACR. We affirm.

### Factual/Procedural History

In December 2004, Atlantic Carolina Retail, LLC (Atlantic) loaned $3,075,000 to Monarch Development, LLC (Monarch Development). Atlantic collateralized the loan by taking a mortgage on three properties in Charleston, South Carolina: (1) 635 King Street (King Street parcel), (2) 141 St. Phillips Street (St. Phillips parcel), and (3) Pinehaven Shopping Center (Shopping Center parcel). Atlantic purchased a title insurance policy (the policy), valued at $3,075,000, from First American to insure these mortgage interests against potential title defects. Subsequently, Atlantic assigned the mortgages

and secured debt to Preservation Capital, a related entity owned by the same group of investors.

In 2008, Monarch Development sold the St. Phillips parcel and paid Preservation Capital $250,000 to release its lien on that property. Subsequently, Monarch Development defaulted on its loan agreement with Preservation Capital. Thereafter, Preservation Capital performed a title search on the King Street and Shopping Center parcels in preparation for foreclosure. Preservation Capital discovered Monarch Development never owned the King Street parcel; instead, Monarch Holdings, LLC (Monarch Holdings) owned the property at the time Preservation Capital purported to take a mortgage interest. Monarch Holdings later transferred the property to a third party without payment or notice to Preservation Capital. On the date of transfer, the King Street parcel was valued at $590,000 and was subject to a $244,665 lien held by First Palmetto Savings Bank, which was recognized in the policy as senior to Preservation Capital's purported mortgage interest. Thus, but for the title defect, Preservation Capital would have been able to collect $345,335 from sale of the King Street parcel—the value of the parcel after subtracting the amount of the senior lien.

Preservation Capital ultimately foreclosed on the Shopping Center parcel. Atlantic purchased the property at the foreclosure sale by way of a credit bid for $3,250,000. At the time of the foreclosure sale, Monarch Development's debt to Preservation Capital had risen to $3,641,190. Thus, after foreclosing on the Shopping Center parcel, Monarch Development owed Preservation Capital a remaining balance of $391,190. Thereafter, Preservation Capital filed a claim under its policy with First American for $345,335—the amount it was unable to collect on the King Street parcel due to the title defect. First American denied coverage.

The policy provides it insures against loss or damage, not exceeding the policy limit of $3,075,000 listed in Schedule A, sustained or incurred by reason of "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein." Section 2 of the policy, titled, "Continuation of Insurance," governs situations in which the insured acquires title to the collateral through foreclosure. Section 2 provides:

(a) *After Acquisition of Title:* The coverage of this policy shall continue in force ... in favor of ... an insured who acquires **all or any part of the estate or interest in the land by foreclosure** ....

....

(c) *Amount of Insurance:* The amount of insurance after the acquisition [shall not] exceed the least of:

(i) the amount of insurance stated in Schedule A; [or]

(ii) the amount of principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made....

Section 9, titled, "Reduction of Insurance; Reduction or Termination of Liability," provides:

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the amount of insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of [First American] except as provided in Section 2(a) of these Conditions and Stipulations.

Section 14, titled, "Liability Limited to this Policy; Policy Entire Contract," provides:

(a) This policy together with all endorsements, if any, attached hereto by [First American] is the entire policy

and contract between the insured and [First American]. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage ... shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of [First American].

After First American denied coverage on the King Street parcel's title defect, Preservation Capital filed this action. Both parties moved for summary judgment. Preservation Capital argued it was entitled to coverage under section 2 of the policy because it could have collected $345,335 from the sale of the King Street parcel but for the title defect, noting that even after acquiring the Shopping Center parcel, Monarch Development owed Preservation Capital a balance of $391,190. First American, on the other hand, argued section 9(b) of the policy terminated coverage because Preservation Capital acquired the Shopping Center parcel valued at $3,250,000, which is beyond the policy's face value of $3,075,000.

Initially, the circuit court denied both motions, finding summary judgment was improper because the policy language was ambiguous. In response, the parties filed a joint motion for reconsideration, stipulating the policy was unambiguous and no genuine issues of material fact existed. Thereafter, the circuit court granted summary judgment in favor of Preservation Capital, finding the policy provided coverage in this instance because Preservation Capital did not acquire the King Street parcel and suffered a loss due to a title defect.

The circuit court found the "language of [section] 9, read consistently with [section] 2(c), yields the same amount of insurance, $452,731.48." The circuit court noted that at the time of the foreclosure sale, Monarch Development owed Preservation Capital $3,641,190. Consequently, the $3,250,000 credit bid Preservation Capital was awarded on the Shopping Center parcel did not satisfy the debt in full; instead, the credit bid simply reduced the debt to $391,190. The circuit

court further noted the debt appreciated to $452,731.48 by acquiring interest from the date of foreclosure until the entry of judgment in this action, which is covered by the policy. Therefore, the circuit court concluded, coverage remained in the amount of $452,731.48. The circuit court noted, however, that Preservation Capital could recover only to the extent of its loss resulting from the King Street parcel's title defect—$345,335.

## ISSUE PRESENTED

Whether the circuit court erred in granting summary judgment in favor of Preservation Capital.

## STANDARD OF REVIEW

■ In reviewing a grant of summary judgment, the appellate court applies the same standard as the trial court under Rule 56(c), SCRCP. *Quail Hill, L.L.C. v. Cnty. of Richland,* 387 S.C. 223, 234, 692 S.E.2d 499, 505 (2010). Summary judgment is proper if, viewing the evidence in a light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), SCRCP.

## ANALYSIS

First American argues the circuit court erred in granting Preservation Capital's motion for summary judgment and misconstrued the policy to provide coverage beyond the stated policy limit. First American contends section 2(c) is inapplicable because it relates to property acquired through foreclosure, and although Preservation Capital acquired the Shopping Center parcel via foreclosure, it did not acquire the King Street parcel through foreclosure or otherwise. First American further contends section 2(c) is not intended to define the amount of insurance remaining on the policy where one property is acquired through foreclosure, but other properties are not and continue to serve as collateral under the insured mortgage. Instead, First American asserts section 9 governs Preservation Capital's claim. First American argues section 9(b) dictates that coverage declines as the debt is paid, and the $3,250,000 collected from the Shopping Center parcel reduced the policy's stated limit of $3,075,000 to $0. First American

further contends the circuit court erred in including interest and expenses accrued prior to foreclosure, thereby providing $3,641,190 in coverage despite the policy's stated limit of $3,075,000. Finally, First American argues the circuit court erred in failing to consider the available endorsements Preservation Capital could have purchased, but did not, which provide the coverage Preservation Capital now seeks.

 "Insurance policies are subject to the general rules of contract construction. The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language. Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary, and popular meaning." *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012) (internal citations omitted). "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect. Ambiguous or conflicting terms, however, must be construed liberally in favor of the insured and strictly against the insurer. It is a question of law for the court whether the language of a contract is ambiguous." *Id.* at 615, 732 S.E.2d at 628 (internal citations omitted).

 Generally, title insurance operates to protect a purchaser or mortgagee against defects in or encumbrances on title. *Firstland Vill. Assocs. v. Lawyer's Title Ins. Co.*, 277 S.C. 184, 186, 284 S.E.2d 582, 583 (1981). A title insurer is generally liable for losses or damages caused by defects in the property's title, and defects for which title insurance policies provide coverage may generally be defined as liens and encumbrances that result in a loss in the title's value. *Whitlock*, 399 S.C. at 615, 732 S.E.2d at 628 (quoting *Stanley v. Atl. Title Ins. Co.*, 377 S.C. 405, 411, 661 S.E.2d 62, 65 (2008)). The terms of individual insurance agreements can control the method of valuation, but the purpose of title insurance has been stated as seeking to place the insured in the position he thought he occupied when the policy was issued. *Id.* Generally, the measure of damages should "compare the encumbered value of the entire tract of . . . land with what the value of the entire tract of land would be without any encumbrances." *Id.*

In *Hodas v. First American Title Insurance Co.,* 696 A.2d 1095 (Me.1997), the Supreme Court of Maine addressed a title insurance claim involving facts similar to this case. Hodas, a lender, took a mortgage against a piece of property to secure a $71,000 debt and purchased a $71,000 title insurance policy to secure his mortgage interest. *Id.* at 1096. After the borrower defaulted, Hodas foreclosed the mortgage and purchased the property with an $80,000 credit bid. *Id.* Prior to foreclosure, the borrower's debt had increased from $71,000 to $108,348.87. *Id.* When Hodas later attempted to sell the property, he discovered another party had an ownership interest. *Id.* Consequently, Hodas made a claim on the title insurance policy, which insured title to the property was solely in the borrower's name, and the insurer denied coverage. *Id.*

The Supreme Court of Maine held Hodas was entitled to coverage for loss resulting from the title defect. *Id.* at 1097–98. Interpreting a clause seemingly identical to section 2(b) of the policy at issue in this case, the court stated,

> After an insured mortgagee purchases the mortgaged premises at foreclosure, coverage continues provided there remains unpaid principal indebtedness. Coverage is limited, however, to the lesser of the outstanding indebtedness or the stated policy limit. In the case at bar, after Hodas purchased the ... property at foreclosure for $80,000, there remained a loan deficiency of $28,348.87. That amount, since it was less than the stated policy limit of $71,000, comprised the maximum limit of Hodas's recovery provided by the continued coverage.

*Id.*

■ We find the circuit court properly granted summary judgment in favor of Preservation Capital because section 2 of the policy unambiguously provides coverage for the loss resulting from the King Street parcel's title defect. In arguing otherwise, First American overcomplicates the matter at hand. In determining whether Preservation Capital is entitled to recover under the policy, the Court must determine (1) Preservation Capital's damages; (2) whether those damages are covered by the policy; and (3) if so, what amount is recoverable.

First, Preservation Capital incurred damages in the amount of $345,335—the portion of Monarch Development's debt that

it would have been able to collect but for the King Street parcel's title defect.

Second, the policy unambiguously covers Preservation Capital's damages. The policy states it insures against loss or damage sustained by reason of "[t]itle to the [collateral] . . . being vested other than as stated" in the policy. Thus, the policy clearly covers Preservation Capital's damages resulting from title to the King Street parcel being vested in Monarch Holdings, while the policy stated Monarch Development had title to the property. Moreover, section 2(a) of the policy states Preservation Capital's coverage continues despite having acquired title to the Shopping Center parcel via foreclosure. Specifically, section 2(a) provides that coverage continues even if an insured acquires "all or any part of the estate or interest in the land" by way of foreclosure. Here, Preservation Capital acquired title to the Shopping Center parcel via foreclosure, but not the King Street parcel. Accordingly, because Preservation Capital acquired "part" of the collateral, coverage clearly continues under section 2(a).

Finally, as for the amount of coverage available, section 2(c) states the amount of insurance after acquiring property via foreclosure shall not exceed the lesser of the $3,075,000 policy limit or the amount of unpaid principal indebtedness secured by the insured mortgage, coupled with interest and expenses, but reduced by the amount of all payments made. Here, after Preservation Capital acquired the Shopping Center parcel, Monarch Development remained indebted for $391,190, which appreciated to $452,731.48 by gaining interest from the date of foreclosure until the entry of judgment in this action. Accordingly, coverage would be limited to $452,731.48, as that amount is less than the $3,075,000 policy limit. However, Preservation Capital may only recover the portion of that debt that it would have been able to collect but for the King Street title defect— $345,335.

We note, section 9(b) of the policy does not affect Preservation Capital's coverage. Section 9(b) simply explains that the amount of coverage is reduced *pro tanto* as the borrower makes loan payments to the insured lender. Section 2, on the other hand, governs situations in which the insured lender, after default, acquires all or part of the collateral via foreclosure. Here, Preservation Capital foreclosed on the Shopping

Center parcel after Monarch Development failed to make payments and defaulted on its loan obligations. Accordingly, section 2, rather than section 9, governs Preservation Capital's remaining coverage.

In essence, First American takes the position that under section 9(b), coverage declines by the amount of any funds paid to the insured lender, whether those funds are received as payment on the loan agreement, via foreclosure after default, or otherwise. Thus, First American asserts the $3,250,000 collected from the Shopping Center parcel reduced the policy's stated limit of $3,075,000 to $0. However, this is contrary to the most basic protections title insurance is intended to afford and would allow insurers to escape liability upon the insured receiving a payment that does not eliminate the risk for which he purchased the policy; that is, anytime debt grows to exceed the original principal amount, which is usually the same as the policy limit, and is later paid down by foreclosing on a portion of the collateral, the amount of insurance will be reduced to nothing if the foreclosure credit bid exceeds the policy limit, regardless of whether the debt is paid in full. *See Paramount Props. Co. v. Transamerica Title Ins. Co.,* 1 Cal.3d 562, 83 Cal.Rptr. 394, 463 P.2d 746, 750 (1970) ("In procuring title insurance, a lender seeks to insure himself against the risk that a defect in the underlying title may invalidate his lien and leave him in the status of an unsecured creditor. That risk continues so long as the lender does not receive final and unconditional payment of the loan proceeds."); *see also Whitlock,* 399 S.C. at 615, 732 S.E.2d at 628 (stating the purpose of title insurance is "to place the insured in the position that he thought he occupied when the policy was issued"); *Firstland,* 277 S.C. at 186, 284 S.E.2d at 583 (explaining that title insurance operates to protect a mortgagee from loss resulting from encumbrances on title).

Instead, as the court held in *Hodas,* an insured mortgagee's coverage should continue after he purchases the mortgaged property at foreclosure provided there remains unpaid principal indebtedness. 696 A.2d at 1097–98. In this instance, the insured's recovery will be limited to the lesser of the outstanding indebtedness or the stated policy limit. *Id.* Section 9(c) bolsters this view by explaining that it is "[p]ayment in full" of the debt that terminates the insurer's liability, rather than a fortuitous credit bid. While insured lenders

bear the risk of repayment from the borrower, title insurance companies bear the risk of inadequate security due to title defect.

We further find the circuit court properly declined to consider endorsements that were not made part of the policy because the parties stipulated, and the Court agrees, that the policy is unambiguous. *See Duncan v. Little,* 384 S.C. 420, 425, 682 S.E.2d 788, 790 (2009) (stating extrinsic evidence may only be considered if the contract is ambiguous); *Stevens Aviation, Inc. v. DynCorp Int'l, L.L.C.,* 394 S.C. 300, 307, 715 S.E.2d 655, 659 (Ct.App.2011) ("When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions."). The case First American cites in support of its argument, *Long v. Adams,* 280 S.C. 401, 405, 312 S.E.2d 262, 265 (Ct.App.1984), states, "When construing an insurance policy containing an endorsement, the policy and the endorsement are to be read together." However, the policy in this case does not contain an endorsement; rather, First American is attempting to introduce endorsements not made part of the contract, which is improper in light of the policy's unambiguous terms. *See Duncan,* 384 S.C. at 425, 682 S.E.2d at 790; *Stevens Aviation,* 394 S.C. at 307, 715 S.E.2d at 659. Moreover, the policy itself forbids consideration of extrinsic endorsements. Section 14 states the "policy together with all endorsements, if any, attached hereto by [First American] is the entire policy and contract between the insured and [First American]." Section 14 further provides that "[a]ny claim of loss or damage . . . shall be restricted to [the] policy." Thus, consideration of extrinsic endorsements would be improper under both South Carolina's evidentiary jurisprudence and the plain language of the policy.

Accordingly, we find the circuit court properly granted summary judgment in favor of Preservation Capital.

## CONCLUSION

We affirm the circuit court's grant of summary judgment in favor of Preservation Capital.

**AFFIRMED.**

BEATTY, KITTREDGE and HEARN, JJ., concur.
PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent and would reverse the order granting summary judgment in this contract interpretation case.

First American (Insurer) issued a borrower's title insurance policy to Preservation Capital's (Lender's) predecessor in interest insuring Lender's mortgage interest in three properties against title defects. The amount insured under the policy in Schedule A was $3,075,000. One of the three properties (St. Phillip parcel) was released from the mortgage in 2008. The borrower subsequently defaulted on its mortgage, at which time it was learned the mortgage was invalid to the extent it purported to cover the King Street parcel since borrower did not own that property. The King Street parcel had in fact been sold by its true owner in 2006, with Lender receiving nothing from that sale.

In 2010, Lender foreclosed on the third parcel, the Shopping Center, which was purchased by a credit bid for $3,250,000. At the time of this foreclosure, the borrower owed Lender $3,641,190 on the mortgage.

The differences between the amount due under the mortgage ($3,641,190) and the value of the credit bid ($3,250,000) is $391,190. Lender seeks to recover not this differential, but rather the loss it alleges it suffered at the time the King Street parcel was sold. Under Lender's view, since that property sold for $590,000 subject to a priority lien of $244,665, had Lender had the title to the King Street parcel that Insurer's policy insured it did, then Lender would have netted $345,335 from the King Street sale. In this suit, Lender seeks to recover this 'lost' $345,335 from Insured, offsetting that against its 'loss' in the foreclosure of $391,190.

The majority finds the circuit court properly granted Lender summary judgment under the policy, finding Insurer liable for Lender's loss from the sale of the King Street property. I agree with Insurer that Lender suffered no loss under the policy, and that the circuit court and the majority misread sections 2 and 9 of the policy. I would therefore reverse the circuit court's order.

Section 9 of the policy is captioned "Reduction of Insurance: Reduction or Termination of Liability," and provides for situa-

tions where payments on the mortgage act to reduce coverage under the policy. Section 9(a), (b), and (c).

Section 9 also provides that after a reduction, certain events, e.g., the accrual of interest and other advances, can raise the amount of the insurance coverage "provided in no event shall the amount of insurance be greater than the amount of insurance stated in Schedule A," i.e., $3,075,000. Section 9(b). Under Section 9(c), the foreclosure of the mortgaged property terminates the Lender's policy.

Section 9 is implicated here because the Shopping Center property was foreclosed, and Lender's mortgage satisfied. The foreclosure price was $3,250,000, an amount which exceeds the value of the mortgage interest insured under this policy ($3,075,000).[1] With this foreclosure, Lender received the full value of its insured interest, and thus suffered no loss as a result of the title defect in the King Street collateral.[2] Section 7(a)(iii). The foreclosure and satisfaction of Lender's mortgage terminated this Lender's policy, except as provided in Section 2. Section 9(c).

Section 2 converts a lender's title insurance policy to an owner's insurance policy when the lender acquires title to the property described in the policy. Section 2 applies only to the property the lender has acquired title to in a "legal manner which discharges the lien of the insured mortgage ...." Section 2(a).[3] In other words, when Lender acquired an interest in the insured property through foreclosure, i.e. the Shopping Center, the policy was converted to an owner's title insurance policy on that parcel. Section 2(a).

Section 2(c) then establishes the amount of coverage the now-owner has under the converted policy. This section

---

1. This is the maximum amount insured under the policy, which does not, as the majority holds, insure the total indebtedness under the mortgage. *See* Section 9(c) (accrued interest, etc. can never "be greater than the amount of insurance stated in Schedule A").

2. Had Lender received less than $3,075,000 in its foreclosure, then the title defect in the King Street property would be relevant to establish a claim under the policy.

3. Both the circuit court and the majority err when they apply Section 2 to the King Street property, since as the facts make clear, Lender neither had nor acquired title to that parcel.

provides in relevant part that the insured amount is the **lesser** of (i) the amount in Schedule A [here $3,075,000]; or (ii) the amount of principal, interest, expenses and certain advances [4] made prior to the acquisition of the property ($3,641,190) less payments made, here the $3,250,000 credit bid. Under Section 2(c), Lender's newly converted owner's policy on the Shopping Center parcel protects it against loss by title defects in the amount of $391,190, the lesser figure. *Hodas v. First Am. Title Ins. Co.*, 696 A.2d 1095 (Me.1997).

The majority misapprehends the effect of Section 2(c). This section simply establishes the formula for determining coverage under the newly-converted owner's title policy on the Shopping Center, and is irrelevant to any purported loss under the Lender's policy related to the King Street property. As *Hodas* demonstrates, if in the future Lender were to sell the Shopping Center, and were that sale to be affected by a title defect, then Insurer would be liable for up to $391,190. Section 2 applies only to insure title (not a mortgage interest) to the Shopping Center now owned by Lender.

I would reverse the grant of summary judgment to Lender. The policy insured Lender against loss of up to $3,075,000 due to a title defect on the mortgage secured by these three properties, and never against any greater amount. The mortgage was discharged through a foreclosure sale, which brought more than the insured value. Thus there was no loss under Lender's title insurance policy. The policy was then converted to an owner's policy, insuring Lender's title to the Shopping Center.

---

4. This language tracks that of Section 9(b).