# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jericho State Capital Corp. of Florida, Plaintiff,

v.

Chicago Title Insurance Company, Defendant,

AND

Lynx Jericho Partners, LLC, Plaintiff,

v.

Chicago Title Insurance Company, Defendant,

Of whom Jericho State Capital Corp. of Florida and Lynx Jericho Partners, LLC are the Appellants,

and Chicago Title Insurance Company is the Respondent.

Appellate Case No. 2017-001646

---

Appeal From Horry County
Karl A. Folkens, Special Referee

---

Opinion No. 5731
Heard February 6, 2020 – Filed June 10, 2020
Withdrawn, Substituted, and Refiled October 7, 2020

---

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Fred B. Newby, Sr., and C. Scott Masel, both of Newby Sartip & Masel LLC, of Myrtle Beach, for Appellants.

Demetri K. Koutrakos, of Callison Tighe & Robinson, LLC, of Columbia, for Respondent.

---

**HILL, J.:** We are presented with the question of whether a reservation of a right-of-way on an official county map—as authorized by section 6-7-1220 of the South Carolina Code (2004) and a county ordinance—constitutes a defect in or encumbrance on the title to the affected land or renders its title unmarketable so as to come within the coverage of two title insurance policies. Based on the specific circumstances of this case, we hold it does. We further conclude none of the policies' coverage exclusions apply. We therefore reverse the order of the special referee granting Chicago Title Insurance Company (Chicago Title) summary judgment as to Jericho State Capital Corporation of Florida's (Jericho's) and Lynx Jericho Partners, LLC's (Lynx Jericho's) (collectively Appellants) claims for breach of contract. We affirm, however, the order granting summary judgment to Chicago Title on Appellants' bad faith claim.

## I.    FACTS

South Carolina law allows counties and municipalities to "establish official maps to reserve future locations of any street, highway, or public utility rights-of-way, public building site or public space open for future public acquisition and to regulate structures or changes in land use in such rights-of-way, building sites or open spaces." § 6-7-1220. In 1999, the Horry County Council established an official map by passing Ordinance 107-98 or the Official Map Ordinance (Ordinance).

The Ordinance created the official map to "show the location of existing or proposed public streets, highways and utility right-of-ways, public building sites and public open spaces." The Ordinance further provided that after the official map was adopted, "no building, structure, or other improvement, shall hereinafter be erected, constructed, enlarged or placed within the reservation area . . . without prior exemption or exception . . . ." The purpose of the Ordinance and the official map was to provide for the public welfare and Horry County's financial convenience by "designating and reserving" such locations. The Ordinance established a procedure for landowners to appeal land use restrictions and provided a criminal penalty for violating the Ordinance. Later in 1999, Horry County created the index map, which included the proposed locations for segments of the Carolina Bays Parkway.

In 2002, Horry County Council adopted Ordinance 88-202 (the 2002 Amendment), which amended the official map to add "the right-of-way identified as Alternative 1 for the proposed Carolina Bays Parkway . . . as shown in the document entitled 'Carolina Bays Parkway, Phase V FEIS Conceptual Roadway Plans.'" The roadway plan was attached to the 2002 Amendment, and the amended index map showed the Parkway bisecting the property at issue in this appeal and crossing the intracoastal waterway. Both the Ordinance and the 2002 Amendment were recorded with the Register of Deeds and indexed under Horry County.

In 2006, Peachtree Properties of North Myrtle Beach, LLC (Peachtree) purchased 131.40 acres in Horry County (the Property), which it planned to develop as a residential subdivision along the waterway, from the McClam family for $22,500,000. Peachtree financed the purchase with two mortgage loans, granting a first mortgage to R.E. Loans, LLC (REL) and a second mortgage to Jericho. Both REL and Jericho received title insurance from Chicago Title. The title insurance policies are printed on the 1992 standard form of the American Land Title Association and contain the following identical language and provisions:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE . . . AND THE CONDITIONS AND STIPULATIONS, CHICAGO TITLE INSURANCE COMPANY . . . insures, as of Date of Policy . . . against loss or damage . . . sustained or incurred by the insured by reason of: . . .
>
> ***
>
> 2. Any defect in or lien or encumbrance on the title;
>
> 3. Unmarketability of the title . . . .

In 2007, Peachtree defaulted on its loans. Jericho foreclosed, successfully bid on the Property at sale, and received a master's deed subject to the REL mortgage. In 2009, the South Carolina Department of Transportation (SCDOT) filed an eminent domain action against Jericho to take 10.18 acres of the Property for the Carolina Bay Parkway. Meanwhile, for reasons not pertinent here, the REL mortgage was assigned to Lynx Jericho. In 2014, a jury awarded Jericho and Lynx Jericho $2.1 million as just compensation for the taking. During the five-year condemnation litigation, Jericho and Lynx Jericho submitted title insurance claims to Chicago Title, which Chicago Title denied.

In response to the denial of coverage, Jericho and Lynx Jericho sued Chicago Title for breach of contract, breach of the covenant of good faith and fair dealing, and bad faith refusal to pay insurance benefits. The cases were consolidated and referred to the special referee, who heard arguments on the parties' cross motions for summary judgment and conducted the proceedings expertly. The special referee denied Appellants' motion for summary judgment and granted Chicago Title summary judgment, ruling: 1) the Ordinance did not create a defect or encumbrance on the Property; 2) the Ordinance did not make title to the Property unmarketable; 3) exclusions 1, 2 and 3(d) barred coverage; and 4) Chicago Title did not act in bad faith by contesting Appellants' claims. This appeal followed.

## II.  STANDARD OF REVIEW

We review grants of summary judgment using the same yardstick as the trial court. *Woodson v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014).  We view the facts in the light most favorable to Appellants, the non-moving parties, and draw all reasonable inferences in their favor. *NationsBank v. Scott Farm*, 320 S.C. 299, 303, 465 S.E.2d 98, 100 (Ct. App. 1995). Chicago Title is entitled to summary judgment only if "there is no genuine issue as to any material fact". Rule 56(c), SCRCP. Summary judgment is a drastic remedy to be invoked cautiously and must be denied if Appellants demonstrate a scintilla of evidence in support of their claims. *Hancock v. Mid-South Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009).

## III.  COVERAGE UNDER THE TITLE INSURANCE POLICIES

A. <u>General considerations regarding title insurance policy coverage</u>

Title insurance is designed to protect a real estate purchaser or mortgagee against defects in or encumbrances on the title; the purpose of title insurance is to "place the insured in the position he thought he occupied when the policy was issued." *Pres. Capital Consultants, LLC v. First Am. Title Ins. Co.*, 406 S.C. 309, 316, 751 S.E.2d 256, 260 (2013). "Title insurance, instead of protecting the insured against matters that may arise during a stated period after the issuance of the policy, is designed to save him harmless from any loss through defects, liens, or encumbrances that may affect or burden his title when he takes it." *Firstland Vill. Assocs. v. Lawyer's Title Ins. Co.*, 277 S.C. 184, 186, 284 S.E.2d 582, 583 (1981) (quoting *Nat'l Mortg. Corp. v. Am. Title Ins. Co.*, 261 S.E.2d 844, 847–48 (N.C. 1980)); *see also Loflin v. BMP Dev., LP*, 427 S.C. 580, 595–96, 832 S.E.2d 294, 302 (Ct. App. 2019). One court has well explained:

> The sole object of title insurance is to cover possibilities of loss through defects that may cloud the title  Some defects will be disclosed by a search of the public transfer records; others will be disclosed only by a physical examination or a survey of the property itself. Often the existence of title defects will depend upon legal doctrines and judicial interpretations of various applicable statutes. Since the average purchaser has neither the skill nor the means to discover or protect himself against the myriad of defects, he must rely upon an institution holding itself out as a title insurer.

*United States v. City of Flint*, 346 F. Supp. 1282, 1285 (E.D. Mich. 1972).

As a leading commentator notes:

> [T]itle insurance policies usually cover risks arising from errors in title examination, some known defects, defects that would be disclosed by examination, and some undisclosed defects that would remain hidden even after competent examination of public records . . . . In that sense, title insurance is "all-risks" coverage, under which a loss must fall within the basic description of the covered peril—such as a "defect in or a lien or encumbrance on the title"—and not be within any explicit exclusions.

11A Maldonado et al., *Couch on Ins*. § 159:20 (3d ed. 2019) (footnotes omitted).

We interpret the language of title insurance policies like other contracts and enforce plain and unambiguous language as written, giving the words their common meaning. *Williams v. Gov't Ins. Co. (Geico)*, 409 S.C. 586, 594, 762 S.E.2d 705, 709 (2014). Whether coverage exists under an insurance policy is a matter of law. *Id.* at 593, 762 S.E.2d at 709.  The insured bears the burden of proving its claim falls within the policy's coverage. *Gamble v. Travelers Ins. Co.*, 251 S.C. 98, 103, 160 S.E.2d 523, 525 (1968).

B.  Defect, lien, or encumbrance

The policies insure Appellants from damages incurred by any "defect in or lien or encumbrance on the title." Appellants assert the Ordinance caused a defect in or encumbrance on the title because it created a third-party interest in the Property in favor of the County, which burdened the land and depreciated its value. We agree.

The policies do not define the term "encumbrance," but we have. An early case, noting encumbrance was a catch-all term found in English conveyances, defined it as any weight on the land that lowers its value without conflicting with passing of the fee. *Grice v. Scarborough*, 29 S.C.L. (2 Speers) 649, 652–53 (1844). More recent decisions have said the same thing in different ways, defining an encumbrance as "a right or interest in the land granted 'which may subsist in third persons to the diminution in value of the estate although consistent with the passing of the fee.'" *Truck S., Inc. v. Patel*, 339 S.C. 40, 48, 528 S.E.2d 424, 428–29 (2000) (quoting *Martin v. Floyd*, 282 S.C. 47, 51, 317 S.E.2d 133, 136 (Ct. App. 1984)); *see also Pres. Capital Consultants, LLC*, 406 S.C. at 316, 751 S.E.2d at 259 ("[D]efects for which title insurance policies provide coverage may generally be defined as liens and encumbrances that result in a loss in the title's value."). An encumbrance is a burden on the land that is adverse to the landowner's interest and impairs the value of the land but does not defeat the owner's title.  *Butler v. Butler*, 67 S.C. 211, 45 S.E. 184, 185 (1903); *see* 21 C.J.S. Covenants § 18 (2020) ("[A]n 'encumbrance' is any right or interest held by someone other than the grantee or grantor which diminishes the value of the estate but not so much that it leaves the grantee with no title at all. That is, an 'encumbrance,' within the meaning of a covenant against encumbrances, is any interest in a third person consistent with a title in fee in the grantee, if such outstanding interest injuriously affects the value of property or constitutes a burden or limitation upon the rights of the fee title holder." (footnotes omitted)).

The Ordinance described the location of the highway as a "right-of-way," and defined "right-of-way" as "land reserved . . . for a road."  The Ordinance declared its intention to "reserve" future locations of highways and proscribed any use of the Property that would interfere with the County's future acquisition of the highway parcel, and the Ordinance and amended map showing the location of the proposed highway were publicly recorded. As Chicago Title argues, the Ordinance allowed affected property owners to appeal their property's inclusion on the map, but that proves Appellants' point that the Ordinance encumbered the Property.

Ordinances may regulate land use without encumbering title, but the Ordinance here

went beyond regulating use and created a third-party interest in the property in favor of the County. The enabling statute separates the concept of right-of-way from land use. *See* § 6-7-1220 (noting one purpose of official map is to "regulate structures or changes in land use in such rights-of-way"). We agree with Appellants that the Ordinance, including its provisions regarding the appeal procedures and penalties for violations, constituted an encumbrance within the meaning of the policy coverage. Although Chicago Title is correct that the Ordinance did not create a right-of-way, the policy coverage turns not on whether the Ordinance created a legal right-of-way but whether it created a defect or encumbrance.

We find the Ordinance similar to the acquisition map at issue in *Ascot Homes, Inc. v. Lawyers Mortgage & Title Co.*, 237 N.Y.S.2d 179, 180–81 (N.Y. Sup. Ct. 1962). There, a 1949 county map marked a strip of certain land for public acquisition. When Plaintiff purchased the land in 1960, he applied to the zoning authority for a building permit. The permit was denied because, without the marked strip, plaintiff's lot was not large enough to meet setback requirements. When plaintiff then tried to sell the land, a purchaser refused to close, citing the map. Plaintiff's title insurer denied his claim, pointing to the exclusion from coverage for "[z]oning restrictions or ordinances imposed by any governmental body." The court, however, held plaintiff's loss was covered because the acquisition map qualified as a lien or encumbrance not excepted by the policy.

*Ascot Homes* is cited in a standard title insurance law treatise. Palomar, *Title Insurance Law* §§ 5.9, 6.3, 6.9 (2020 ed.). It has also been analyzed in a work published by the drafter of the policy forms and language at issue here. Nielsen, *Title and Escrow Clams Guide* § 11.1.5 (American Land Title Association, 2020). The analysis describes the import of *Ascot Homes* in detail and contends the decision prompted a 1970 change in the standard title insurance policy language to allow coverage for eminent domain as long as the "notice of the exercise thereof" appeared in the public records as of the date of the policy (this same language appears in Exclusion 2 of the policy here, as we later discuss in section IV.B). Yet, as the author points out, the acquisition map in *Ascot Homes* "did not 'exercise' the condemnation power," so its relationship to eminent domain coverage is inapposite. *Id*. Like the map in *Ascot Homes*, the Ordinance here is a different creature than an eminent domain proceeding, but it is still a defect or encumbrance triggering coverage.

Chicago Title also argues the policies provide no coverage to Appellants because a title examination of the subject property would not have revealed the Ordinance or map. We can find no support for this position in the policy. The coverage the policy promises is not limited to what a title examination reveals. The policy does not

define a covered defect, lien, or encumbrance as something that can only exist if it resides in the chain of title.

According to Chicago Title, a ruling that the Ordinance constitutes a defect, lien, or encumbrance will saddle real estate lawyers and title abstractors with the risk of liability for title defects that cannot be found in the chain of title. We are confident real estate practitioners know how to draft explanations of and exceptions to their title opinions. And this appeal is not about the scope of title opinions but the scope of coverage of a title insurance policy. Chicago Title may wish to shift the risk of loss to real estate lawyers or others, but that is not where the policy here places it.

The special referee warned that if the map and Ordinance constituted a defect, lien, or encumbrance, the entire world of warranty deeds would be upended. We find no justification for such a dystopian view. When Appellants bought the Property, the sellers presumably had notice of the map and the Ordinance showing the county's plan to build a highway through the Property, for the Ordinance declared that a "letter of notification" of the public hearing would be sent to all "property owners whose property lies within an area to be reserved for public use." Whether the sellers had a duty to disclose this knowledge to Appellants—and whether, if they did not disclose it, their silence violated any warranties they gave in the deed—are not questions before us.

We conclude the Ordinance constituted a defect and an encumbrance. We therefore reverse the special referee's grant of summary judgment to Chicago Title as to this issue.

## C. Unmarketability of title

The policies define unmarketability of title as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle . . . the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." This opaque definition—a model of circularity—is unenlightening. We are confident, though, that a purchaser who discovered a portion of the real estate he was about to buy purportedly in fee simple absolute had been reserved by ordinance in favor of a governmental right-of-way may be entitled to rescind the sale. "To be marketable, a title need not be flawless. Rather, a marketable title is one free from encumbrances and any reasonable doubt to its validity. It is a title which a reasonable purchaser, well-informed as to the facts and their legal significance, is ready and willing to accept." *Gibbs v. G.K.H., Inc.*, 311 S.C. 103, 105, 427 S.E.2d 701, 702 (Ct. App. 1993).

Delivery of marketable title requires title be free of not only defects and encumbrances but also the reasonable probability of litigation. *Sales Int'l Ltd. v. Black River Farms, Inc.*, 270 S.C. 391, 398, 242 S.E.2d 432, 435 (1978) (providing a "reasonable probability of litigation" renders title unmarketable). The Ordinance created a reasonable probability of litigation concerning the title because the right-of-way was reserved for acquisition, making future condemnation reasonably probable.

The Ordinance differs from land use and zoning regulations, which can restrict development and impose an economic burden on the owner but do not create a third-party interest in property. *See McMaster v. Strickland*, 305 S.C. 527, 530, 409 S.E.2d 440, 442 (Ct. App. 1991) (holding wetlands designation did not render title unmarketable); *Patel*, 339 S.C. at 49, 528 S.E.2d at 429 ("Because the wetland designation does not render the title unmarketable, Patel cannot rescind the contract based upon an encumbrance."); *Martin*, 282 S.C. at 52, 317 S.E.2d at 136 ("While marsh or water might be a burden upon property, it is certainly not a lien, easement, or a right existing in a third party."). We recognize the Ordinance resembled zoning and other land use tools, given it was to be enforced by the zoning administrator and the enabling statute described the official maps as "instruments of land use control." § 6-7-1220. In substance, though, the Ordinance created a third party interest in the property and is so foreign from typical land use measures that there is no genuine issue of material fact that it rendered Appellant's title unmarketable.

A marketable title is one free from doubt and any reasonable threat of litigation. Unmarketability cannot be based on just any doubt or defect, for almost any title can be flyspecked. But if the doubt is an objectively reasonable one concerning a material defect, then the title is unmarketable. A material defect is one that interferes or conflicts with the rights and incidents of title—the insured's fee simple absolute's "bundle of rights"—to the extent that an ordinary and prudent purchaser would not buy the title, or only buy it at a discount reflecting the defect. 1 Palomar, *Title Ins. Law* § 5.7 (2019 ed.). This meshes with the policy definition of marketability, which explains coverage extends to any "alleged or apparent" matter affecting title.

Chicago Title argues the Ordinance did not affect marketability of the title because it only regulates use of the Property. We conclude, however, that the Ordinance interferes with the insured's title because it limits the rights and incidents of ownership. It is true that matters that affect only the use of land are not title matters, but it does not follow that a matter that affects use cannot also affect title. *Id*. No one would contend, for example, that a covenant restricting use does not also affect title and, therefore, marketability. Because the Ordinance created an interest in the land by reserving a right-of-way and restricting use of the reserved land, we conclude

it diminished the owner's bundle of rights and, consequently, affected title. And the diminishment was enough to cause a reasonable buyer to decline or discount a sale for a price less than what an unclouded title would demand on the market.

There is no factual dispute the Ordinance created a reasonable probability of litigation, thereby making the title unmarketable as a matter of law. The Ordinance, which, again, was publicly recorded, reserved the future site of the highway and took steps to minimize the County's future acquisition costs. Although we agree with Chicago Title that in general all landowners are at risk of eminent domain proceedings at any given time, the County's intent and preliminary steps set forth in the Ordinance foreshadowed a reasonable probability of condemnation. *Black River Farms, Inc.*, 270 S.C. at 398, 242 S.E.2d at 435 (mere possibility or remote probability of litigation is not sufficient to make title unmarketable). Therefore, we hold the Ordinance rendered Appellants' title unmarketable and reverse the special referee's grant of summary judgment to Chicago Title.

## IV.   EXCLUSIONS FROM COVERAGE

In deciding whether a policy exclusion bars coverage, the burden of proof flips: the insurer must prove the exclusion applies. *Owners Ins. Co. v. Clayton*, 364 S.C. 555, 560, 614 S.E.2d 611, 614 (2005) ("Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability.").

### A. Exclusion 1

In relevant part, Exclusion 1 bars coverage for losses arising by reason of:

> Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land . . . .

In granting Chicago Title summary judgment, the special referee ruled Exclusion 1 excluded coverage because the Ordinance merely affected the use of the land. As we have just discussed, the Ordinance related to and affected the title of the land, not just its use. Exclusion 1 therefore does not apply as a matter of law. We reverse the special referee's grant of summary judgment to Chicago Title as to this issue.

### B. Exclusion 2

Exclusion 2 bars coverage for losses arising by reason of:

Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to the Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

Neither Appellants nor Chicago Title claim the Ordinance constitutes an eminent domain action, and Appellants are not seeking coverage for the 2009 condemnation action, which began after the effective date of the policies. The special referee noted the exclusive procedure for eminent domain in this state is the Eminent Domain Procedure Act, S.C. Code Ann. §§ 28-2-10 to -510 (2007 & Supp. 2018). But this misses the mark. Appellants are not seeking recovery of loss for the 2009 condemnation action but for loss the Ordinance caused to the value of their title when they took it in 2007. Appellants contend these losses exceed and are different in kind from those sought in the condemnation action. Therefore, Exclusion 2 does not apply, and the special referee erred in granting Chicago Title summary judgment based on Exclusion 2.

Chicago Title maintains that if the Ordinance constitutes a "defect, lien, or encumbrance" then it necessarily also constituted a taking for which Exclusion 2 excludes coverage. We see several flaws in this logic, the fundamental one being the false equivalency between an encumbrance and a taking. We doubt Chicago Title means that every encumbrance is also a taking, but that is the cul-de-sac where its argument leads.

The issue of whether an Ordinance reserving of a right of way on an official county map adopted pursuant to § 6-7-1220 constitutes a taking has not been decided in South Carolina and is not before us now. The special referee did not rule on the issue. Neither Appellant nor Chicago Title filed a motion to reconsider requesting the Special Referee to make such a ruling, nor have they appealed on this ground. Accordingly, this issue is not preserved for our review. *See Pye v. Estate of Fox*, 369 S.C. 555, 564, 633 S.E.2d 505, 510 (2006) ("It is well settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved.").

C. Exclusion 3(d)

Exclusion 3(d) excludes coverage for "[d]efects, liens, encumbrances, adverse claims or other matters . . . attaching or created subsequent to Date of the Policy." The Ordinance and the 2002 Amendment were filed years before the effective date

of the policies, and therefore clouded the title as of the Date of the Policy. The special referee therefore erred in finding this exclusion applied.

Parties to title insurance contracts are free, within the bounds of public policy, to allocate risks as they see fit. Chicago Title's inability to pigeonhole this unique Ordinance into an exclusion to coverage is unsurprising. Real estate investors buy title insurance to protect against such unforeseen "off the record" risks. Old soldiers say it is the bullet you never hear that kills you, and the fundamental idea behind title insurance is to cover rather than exclude unforeseen and unknown risks; otherwise, title insurance would not provide the peace of mind it touts.

## V.     BAD FAITH

The special referee ruled Chicago Title had a reasonable, good faith basis for contesting Appellants' claims. We agree.

Appellants' bad faith cause of action fails because they did not demonstrate Chicago Title acted unreasonably in denying Appellants' claims. *See Crossley v. State Farm Mut. Auto. Ins. Co.*, 307 S.C. 354, 359, 415 S.E.2d 393, 396–97 (1992) ("The elements of a cause of action for bad faith refusal to pay first party benefits under a contract of insurance are: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured."). The unusual nature of the Ordinance presented close policy interpretation issues. Chicago Title had a reasonable basis for denying the claims, and we affirm summary judgment to them as to this issue. *BMW of N. Am., LLC v. Complete Auto Recon Servs., Inc.*, 399 S.C. 444, 453, 731 S.E.2d 902, 907 (Ct. App. 2012) ("[W]here an insurer has a reasonable ground for contesting a claim, there is no bad faith.").

## VI.     CONCLUSION

Accordingly, we affirm the special referee's grant of summary judgment to Chicago Title on Appellants' cause of action for bad faith, but we reverse the grant of summary judgment to Chicago Title on Appellants' remaining claims and remand to the special referee for proceedings consistent with this opinion. Appellants have not appealed, and we therefore do not address, the grant of summary judgment to Chicago Title on Appellants' breach of covenant of good faith and fair dealing claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS and KONDUROS, JJ., concur.**